When you're ready. Thank you, Your Honor. May it please the Court, Linda Gondara, Deputy Attorney General for the State Defendants. I'd like to reserve five minutes for rebuttal. Okay, let's see if you can do better than the last person. Or we can do better for you. We'll see. Okay. Thank you, Your Honor. Now, in order to assess the SB-84 fee in question here, the Court needs to look at three complementary federal statutes. The first one is the 4R Act. And as this Court found in Union Pacific, under the 4R Act, in 1976, the Congress prohibited discriminatory fees against railroads. But at that time, there was a longstanding state... I'm sorry, it prohibited discriminatory taxes on railroads. But at that time, there was a longstanding history of having regulatory fees on railroads. The Court acknowledged that and found that the regulatory fee at issue in that case was perfectly acceptable. And that fee included a fee for handling hazardous materials. The second act at issue is the Hazardous Materials Transportation Act. Now, that act specifically addresses fees for the transportation of hazardous materials. And what that act states is that states can impose fees for the transportation of hazardous materials, as long as those fees are fair and are for the purposes of emergency response and planning. Now, how do we evaluate fairness? I mean, fairness as between the railroads and the trucking industry? Is that part of the analysis of fair? The DOT decisions addressing fairness and the Court's decisions addressing fairness have looked to commerce clause principles. And we address fairness both in the context of the ICC Termination Act and the Hazardous Materials Transportation Act. But we believe that the primary concern with the Hazardous Materials Transportation Act is the burden on interstate commerce. So I'm not sure I heard the answer. Is part of the fairness analysis permissibly a comparison of fees charged to the railroads and fees charged to the trucking industry? That would be a consideration. But we believe that the Hazardous Materials Transportation Act is not about distinctions between modes of transportation, primarily. The primary concern is commerce clause concern. So what does fairness mean if that's only, in your view, a small part of it? Again, the focus for the Hazardous Materials Transportation Act on fairness is whether it discriminates against or burdens interstate commerce. It's commerce clause principles, primarily. So the RESPA decision talks also about whether the fee is based on some fair approximation of the use of the facilities. And that, we believe, goes to whether or not the fee is used for the regulatory purpose that's imposed by the activity that the fee is being assessed from. In this case, the activity where the fee is being assessed is the shipment of hazardous materials by rail. And the SB84 fee is specifically for the purpose of addressing the gaps in the state's ability to respond to an accident or a spill or, heaven forbid, a catastrophic event. So it's not related to the volume of the material, right? And it's not related to the distance traveled. It is a per-trip fee. So it doesn't assess mileage, but it is for every trip, whether that trip is wholly inside of California or outside of California. There is not a volume component, but the statute and regulations do allow a shipper who believes that their shipment does not create the need for the emergency response to petition to the OAS for a refund of that fee. So you didn't mention the ICCTA? I was just about to get there. So is it preempted by the ICCTA because it regulates the rate of railroad charges to its customers? Unlike the 4R Act, which expressly addresses costs imposed on rails, and HMTA, which expressly addresses the type of fees that are available, the ICC Termination Act says nothing whatsoever about fees. There is nothing in the plain language of the Termination Act addressing fees, and the railroads have not pointed to and we have not found a single case where the ICCTA was held to preempt a fee. We believe that the Termination Act simply has nothing to do with fees and is not, okay, with one caveat. If a fee was so burdensome that it prevented a railroad from operating or it provided a sufficiently serious burden that it would interfere with the railroad's ability to operate their business in a reasonable manner, which is the as-applied test for the Termination Act, then there would be a problem. But other than that, we believe that the Termination Act is not about fees. Now, the railroad argues that the Termination Act preempts the railroads here because it is discriminatory. And the discrimination that they talk about under the Termination Act is the discrimination that you were asking about, Judge Fletcher. And that discrimination is discrimination between truck and rail. But the definition of discrimination is treating similarly situated entities differently without adequate justification. And we believe, as we expressed in our briefs, that here the state has indicated an adequate justification for the fee and that this fee is based on the state's concern about growing amounts of hazardous materials being transported into California, the possibility of a serious event that California simply was not ready to address. What evidence do we have in the record of the degree of risk created by rail transportation of toxic substances compared to trucking transportation of toxic substances, and not just degree of risk but experience that the state of California has had with respect to spills and cleanup costs? Granted, there's nothing in the record about the problems provided or presented by trucks. But what is in the record is evidence of catastrophic incidents involving rail, particularly Dunsmuir. And also there were concerns about the incident in Quebec that generated the first working group study that led to this particular bill. I'm very aware of the problems we've had with rail, particularly at Dunsmuir Curve and the spill into the river. And the prior attempts of California to regulate curves, grades, and so on that we have said you can't do. Yes. And this is another way of trying to get at the same problem. I'm very sympathetic to attempts to resolve the problem. I'm not sure you can do it the way you did it, though. Well, Your Honor, with this particular fee, it is funding response in light of gaps in rail. And rail is fundamentally different in the difficulties in response because with rail, unlike with trucking, trucks are on a highway. It can be cordoned off and easily gotten to. But rail can be very different. The tracks are not on a highway. It's much harder to contain the spill. It's a different need. Additionally, as we pointed out in our briefs, if the fee or the equipment used for a fee is used for an emergency, that does not involve rail, then the fund would have to be reimbursed by the agency or the entity using that equipment. So it would be at no cost to the fee payers for the rail system. If we disagree with you on your reading of the ICCTA and we think that this is a broad preemption statute, it preempts any efforts by states to interfere with the rates that a railroad charges its customers, and by its structure it requires the railroads to add this additional charge to its customers. So we say, okay, we think that it's preempted, the SB84 is preempted by the ICCTA. Does that mean you lose? Is that it for the state? If you decide the fee is preempted by the ICC Termination Act, yes, that would be very bad for the state's position. If the law is preempted, then yes, we lose. But there's a carve-out. I mean, if it's broadly preempted, there's a carve-out for the Hazardous Material Transportation Act, but then you've got to show that it's, quote, fair, right? That's correct. But we believe that these acts do need to be read together. As I said, the ICCTA does not expressly address fees. And the fact that Congress has said- But it broadly talks about the exclusive jurisdiction over transportation rates, everything else. Yes. So it's very broad. We've said there's nothing broader than this. This preempts just about everything. So I guess I'm having trouble seeing why it wouldn't preempt a state statute that requires railroads to charge more to its customers. That seems to be really in the heart of regulation of transportation. Well, again, ICCTA preemption is broad, but you have to look at the plain language. And as I indicated, of course, the plain language says nothing about fees. Now you talk about- So you think it's the choice of words, because SB 84 chose to use the word fee instead of charge, or that makes a difference for the scope of the preemption? It's the same thing, right? It's an additional charge, whether you call it a fee or a charge. It is an additional charge, but, again, there's a longstanding and widespread history of states imposing fees on rail, and there's no reason that the state could not impose the fee directly on the shippers. Indeed, the railroads have conceded that. And if they had, then you wouldn't have a problem with this preemption. But the state chose not to do it, probably for some reasons of its own, but they chose not to do that. So I don't know why that makes a difference, that they didn't choose to impose a fee directly on the shippers. As the Supreme Court in Evansville stated, the choice of the method of collection has historically been left to the states. And if you look to the plain language of the Termination Act and also consider the presumption against preemption, there is no reason from the plain language, and the railroads have cited no case that indicates that that well-established rule, that the states can select the means to collect a fee or a tax, changes the analysis. Okay, you've got about two and a half. Did you save enough? I hope so, Your Honor. Thank you very much. Let's hear from the other side. Good morning, Your Honors. Raymond Atkins on behalf of BNSF and Union Pacific. With your permission, I'd like to start by addressing just two features, particularly discussing the ICTA categorical preemption argument, because you need to agree with the district court on only a single issue to affirm the granted preliminary injunction. I just want to be clear from the outset of the narrowness of the scope of our ICTA categorical preemption argument. We are not arguing that ICTA categorically prevents a state from placing a fee or a tax on the railroads or their customer. We're talking about the collection mechanism that the state chose to use to collect that, and that is the decision to regulate what the railroads charge their customers. And that falls right in the sweet spot of the ICTA's categorical preemption of state interference with the economic relationship between the railroads and their customers. There's no language in the statute that actually precludes that, is there? Precludes them from regulating what they collect from their customers? Yeah, I mean, the language is a little strange. It says, you know, the jurisdiction of the board over transportation by rail carriers and the remedies provided in this part with respect to rates. It doesn't say the board has authority over rates or rate charging. It's not like the filed rate doctrine cases we have. Well, it does say that the board has jurisdiction with respect to rates and that that jurisdiction is exclusive. So that's 49 U.S.C. 10501B1. It's the source of the exclusive jurisdiction of the board. So where does it say? It says transportation by rail carriers and the remedies provided in this part with respect to rates. Right, so it has two different provisions. The first provision says the jurisdiction of the board over transportation by rail. It goes on to talk about with respect to rates classification and rule. So it's the with respect to rates is what gives the board exclusive jurisdiction over what the railroads charge their customers. But isn't that modified by the remedies provided in this part with respect to rates? That's all in a single clause. Yeah, the courts have looked at the two of them together to say that the board's jurisdiction is exclusive and the remedies preempt any state regulation within the same space. And so it's viewed as designed to prevent the railroads, I'm sorry, the states from interfering with this economic relationship and from regulating directly what Congress intended with ICTA was to create uniform centralized economic regulation of the railroad industry. So it's just judge-made law is what you're saying. It doesn't really expressly say that in the statute. Well, it's the gloss that the courts, both the Surface Transportation Board and all the reviewing courts have placed on this prevention provision. But I want to get to an important point about this carve-out. Could you hang on to that point for a moment? I wanted to stay on the point that you were discussing with Judge Ikuda, and that is you talked about it as actually a narrow preemption that the state can't regulate rates, but the state can regulate various things. What happens if the state were not to regulate the rate charged by the railroad but were to regulate what the shippers do and to require that anyone shipping by rail pay X to the state dependent upon what they're shipping? Would that be permissible? Not necessarily, Your Honor. There's two types of analysis of ICTA preemption. There's the categorical preemption, which is that's what I'm referring to as being narrow. The STB and the courts have said there are a few types of state regulations that are so pernicious you don't look at the burden. So that's that. If the state were to try to put the fee directly on the shippers, that would be the as-applied standard. Okay, but I'm after the first one, which is as it were the abstract. That's right, because the first one, that's why I said it's narrow, Your Honor. But as to the first one, would it pass your test as to the first one if the fee were charged directly to the shipper? Yes, Your Honor, it would. And what happens if the statute says, if for their own convenience the shipper and the railroad agree that the railroad may collect this fee owed by the shipper and forward it to the state, they may do so. Is that one going to be okay? So if the state's regulation said that the shipper could agree to have somebody else submit it? Well, it says that the shipper owes X and calculate it however we want to calculate it. And that the railroad could submit it on their behalf. However, if the shipper and the railroad agree voluntarily, without any coercion from the state, it would just be easier for both sides for the shipper to pay that to the railroad, the railroad to submit those payments quarterly to the state. Would that be all right? It would pass the categorical preemption. Okay. Yes, sir. So let me turn to another feature of why I think it's really important to make sure that we're aligned here and what we're arguing this applies to, because Your Honor asked is there a carve-out in HMTA. HMTA says absolutely nothing about the mechanism that they use to collect this charge. All it does is create an additional federal requirement that it be fair. And our position is when you go to harmonize these two statutes, you need to give full effect to both where you can. And ICTA, the categorical part of it that we're talking about, prevents you from directly regulating what the railroads charge their customers. And HMTA adds an additional requirement that it be fair. There's no basis to harmonize the two provisions by essentially overriding the protections that are provided by ICTA. And so you could see, Your Honor, it would be a different analysis if we were advocating that any fee were categorically preempted, because then we'd need to address this interplay between HMTA and ICTA. But that has not been our argument before the district court. And the district court properly concluded that the mechanism was categorically preempted by ICTA. And as Your Honor, the State concedes, if you agree with us on that single point, then you can affirm the grant of the preliminary injunction. Are you saying we don't have to look at the fairness issue? Because I think you were arguing in your briefs that it's a necessary but not sufficient condition and that you could harmonize it that way. That's right, Your Honor. Now, we have an alternative theory of this case, which is that the charge is, in fact, discriminatory, which the district court also agreed with us on. And so that provides you an independent basis to affirm the district court. Does that go to the fairness prong in the HMTA? Yes, absolutely, Your Honor. And it also goes to ICTA's as-applied standard, which prevents discrimination against the railroads. So let me turn to the discrimination claim quickly. Where does that come from, this as-applied standard? I didn't see that in the statute. Again, this is the STB's interpretation of its provision that regulations that discriminate against the railroads or unreasonably burden interstate commerce are preempted. We didn't dig down to the root of it, Your Honor, but actually if you read your City of Auburn case, which is one of the leading ICTA cases, you'll see there's a footnote in there that says that this concept of preemption actually predates 1980. It goes well back in the history of regulation of the railroad industry that Congress intended for states not to either unreasonably burden interstate commerce or to discriminate against the railroads. But it's well, I mean, this as-applied standard, it's bedrock in STB cases, and you'll see it cited with approval. In Adrian Grisfield's case, for example, it cites a whole bunch of cases in the various circuits that have found that. I want to read you a sentence from the district judge's order. Sure. I'm on page 6 of the order. I think it's ER 24, line 7. I'll wait for you to find it. I'm there. Okay. Page 6, line 7. Beginning on line 7, the district court writes, Assuming a fee for transporting hazardous materials otherwise complies with the HMTA, nothing in the ICCTA would preclude a state or local entity from imposing it directly on shippers or on the railroads themselves. Do you disagree with that sentence? Just slightly, Your Honor. I think he was speaking about the categorical preemption because he knows that if it is unduly burdensome or discriminatory, then it would run afoul of ICTA. So I think the judge there was really just speaking to our categorical prohibition on regulating directly the rates that the railroads charge their customers. That's the way I read what he wrote there. And it's consistent with when you read on, he says that this is discriminatory under either ICTA or HMTA or both. I would read it the same way. Okay. But this then simply goes to, he says, now discrimination, that's another question. Yes. Discrimination is addressed both as applied argument under what you call ICTA and HMTA. Absolutely, Your Honor. And the discrimination standard under those two statutes may or may not be identical. Fair point, Your Honor. Got it. So let me just turn to the discriminatory nature of this. And I just want to start with a few things where we're in agreement with the state. We're all in agreement that roughly an equivalent amount of transportation of hazardous materials occurs by rail and by truck. We're all in agreement that the state made a deliberate choice not to apply this charge to the truck industry. There was a prior version of the bill that would have, and they deliberately chose not to. And so from the beginning, it's clear on its face that this bill is discriminatory against the railroads because only our customers are required to pay it, not trucks. So the burden is on the state to come forward with a legitimate justification for it. And you've heard that justification. It's a two-part justification. One is that there's some sort of unique risks of transporting by rail, and there's a gap in their ability to respond to those unique risks. We feel there are two fundamental problems with that as a justification. First is to the unique risk. They speak at great length about the risk of crude oil, and there has been a rise in the transportation of crude oil not only in California but throughout the country. But as we told the district court, that accounts for 2% of the $20 million that they're seeking to raise from railroads. They can't use that as a justification for the other. I'm sorry. Absolutely. My apologies, Your Honor. And so, you know, if you had a company that came to you with some sort of clear discrimination against a subset of their employees, you wouldn't let them justify it by saying that some 2% of our employees creates a problem, and we're going to use that as a justification to discriminate against them all, the whole class. And there is an illustration here, Your Honor, which I think makes my point, which is their decision to apply this fee to intermodal traffic. Now, intermodal traffic refers to what you see coming into and out of the ports on a daily basis, the big little containers that come in. They're like little Lego pieces where they get stacked up real high on the boats. When they get to the port, that container either gets put on a truck or gets put on a railroad to its destination. But the state chose to, if it's a shipment of batteries, a container full of batteries that comes on, only if it goes on the rail will that customer have to pay this charge, where if it goes on the truck, no such charge is applied. And their concerns about crude oil and this very small percentage of the traffic can't justify the breadth of the discrimination that they imposed here. The other argument that they make, Your Honors, is that there's a gap in their ability to respond. Our response to that is that's of their own doing. Yes, Your Honor. Well, what's your response to the comment that rail travel is distinctly different in terms of the location of rails, the perhaps remote areas, and lack of services to those remote areas? So I guess I'd have two responses. One actually goes back to a point that Your Honor asked about what's the evidence in the record about the relative risks. Right. The record is crystal clear that 92 percent of the damage and costs from hazmat spills comes from trucks. And so it's not as though there's a disproportionate burden being placed on the state by the transportation of hazmat by rail. When you say 92 percent, over what time period, and does that include the Dunsmuir spill? Ten years, Your Honor. It does not include the Dunsmuir spill. It does not include the Dunsmuir spill. That's absolutely correct, Your Honor. For those of you who don't know about that, it's a catastrophic spill of toxic chemicals that totally ruined the river. And I assume if you put that in, the percentages are going to change. You're probably right, Your Honor. If I may make one point, though, the way the state responded to that incident is how they should have responded here. They created a charge that applied to all modes of transportation, and it was in place for several years, and then it ended once they raised the funds that they felt they needed to respond. That would have been a modally neutral way of addressing their concern. They responded regulating speed on curves and grades on curves, and you guys fought that and won. Yes, Your Honor. That would be inappropriate. There are federal limits on what the state can do. So you guys persisted in keeping that dangerous curve. I sat on that case. I remember it very well. Well, I won't engage on whether it's dangerous or not, Your Honor, but there are clear – The curve on which that enormously expensive, catastrophically expensive spill occurred, whether we call it dangerous or not. Understood. But let me come back to your question, Your Honor. I didn't quite finish, and I hope I fully respond. Our other response is that even if there is a gap out in rural areas of the country, that's a decision by the state about how it chose to spend state resources. So the railroads and the trucks, they contribute millions of dollars in general tax money to fund, amongst other things, emergency response capabilities. The state perhaps quite logically chose to spend that money to first address trucks. But that can't justify requiring the railroad's customers and only the railroad's customers to pay to fill this gap when the trucks contribute nothing. So if Your Honors, I know I have a minute left, but if you have no further questions for me, I would ask that you affirm the district court's decision to grant the preliminary injunction. Thank you. Thank you. May it please the Court? Just a couple of points. First, it does appear that what we're really arguing about here is simply the collection mechanism. And as I indicated previously, that is something typically left to the states. There's nothing in the plain language of the ICC Termination Act to prevent that. And the railroads have not argued that collecting creates the kind of undue burden that would result in as-applied preemption. Indeed, the state has many times had proxies collecting for them. It is not uncommon in general. Second, the railroads point out to intermodal traffic or the intermodal containers as being problematic. I would like to note with that that that is not a problem with the statute itself. It was an issue that was part of the regulations, and I do not believe it's a grounds for official challenge to the statute. But it's a currently applicable regulation, absent the injunction that's now in place? It is. Yes, it is. And it's a regulation based on the statute? It's a regulation based on the statute, but it is an agency interpretation, and it's not the agency interpretation that's being challenged here. Finally, I just would like to emphasize that cases have consistently found, and primarily I'm referring to Adrian and Blissfield, that a mere regulatory burden that creates an additional expense on a railroad is not sufficient to trigger Termination Act preemption. So even if imposing or getting the mechanism to collect this costs the rail some money, that is not sufficient to require as applied preemption in this case. Instead, as we said, this fee is a response to a real problem that California found with rail, and because the shippers shipping the products into California are creating the risk, California has the authority to impose a fee. Therefore, we respectfully request that the court reverse the preliminary injunction. Okay. Thank you. I thank both sides for a very helpful argument.
judges: W. Fletcher, Ikuta, Freudenthal